on behalf of Weeks Marine. In order to sort of cut to the chase, I think what Judge Lake could not get over in this case and could not get past is probably the same thing that you all are thinking. Instinctively, it is easy to understand that, hey, if Weeks Marine had available to it six weeks before this accident some charts that showed this pipeline, why didn't Weeks Marine go to the charts and maybe the accident? I get that. I get that. If this was a case standing alone between Weeks Marine and Contango, that might make sense, if it was just Weeks and Contango in this situation. But it's not. This was absolutely, essentially a joint venture between the government and Weeks Marine where the government made a promise to Weeks Marine in this joint venture. Was there evidence that the dredging when the cutting of the pipeline occurred was outside the path in the contract? The judge did not rule on that. He did not say that. Was there evidence of that? No, Judge. Right in the path. The briefs say that they were X number of feet outside the designated drilling channel. No, that's not what the evidence was. The evidence was that was called the over-dredging argument or the outside-the-channel argument in this case, and there was no evidence of that, and, in fact, Judge Lake didn't even find that, didn't even come close to touching that particular issue. I'm just asking, was there evidence one way or the other? I understand. No, Your Honor. I don't think there was any evidence of that in the record, of the over-dredging issue. This was a situation, a joint venture situation, where the government made a promise to Weeks Marine. Hey, government, I mean, hey, Weeks Marine, we will tell you where the pipelines are if you do the dredging. But it is not an issue between Weeks Marine and Contango, the pipeline. It's really an issue practically between Weeks Marine and the government of the United States. And I believe that the Holoback decision in the Supreme Court and the followed by the mission of Wisconsin are right on point. And the holding, the two primary holdings of those cases speak volumes. And I'm going to read it. The positive statements of the specifications of the government must be taken as true and binding on the government. And upon the government, the loss must lie, not upon the claimant. In this instance, the positive statement by the government and part of the joint venture was, hey, there are only five pipelines there. And the Fifth Circuit, as well as the Supreme Court, has said that is a misrepresentation. The Fifth Circuit in Michigan and Wisconsin went on to say that the contractor also has no duty to do an independent investigation. Those words are very important. No duty to perform an independent investigation because of the custom and practice for 30 years of relying on the government to tell us where those pipelines are. Essentially, I think what Judge Lake got it wrong in his opinion was contradictory. On the one hand, Judge Lake found that Weeks Marine reasonably relied on the specifications and custom of 30 years. And Judge Lake found no independent investigation was required. But where he contradicts himself, as brilliant as he is, he says, on the other hand, Weeks Marine, you had no duty to provide an independent investigation, but you should have conducted an independent investigation and looked at those charts that just fortuitously showed up on the charts six weeks before the accident. I submit to the court this is a bit of hindsight given what the government and Weeks Marine did for 30 years as part of their custom and practice. In fact, what's interesting is the charts, these NOAA charts that Judge Lake talks about, specifically say, and the evidence is page 9 of our reply memorandum, the evidence in the case was the charts say, hey, Weeks Marine, if you're looking at the charts, don't look at us charts, go to the Corps of Engineers themselves for the most updated pipeline information. So the charts themselves say, go to the Corps. Custom and Industry says, go to the Corps. The contract itself, the promise the government made to Weeks Marine was, go to the Corps. Hypothetically, what if the specifications in this case, the government specification had said, yes, there is a pipeline right here. Yes, the Contango pipeline is here. But the charts, which were never updated until six weeks before this accident, said, no, there was not a pipeline there. What if Weeks Marine had relied upon the charts and said, oh, this is the most updated information. We'd be in real trouble because the accident would have clearly happened at that point. In this case, it is a promise the government made to Weeks Marine, and Michigan, Wisconsin specifically says, and Hollaback says, the loss falls on the government in this case. Do you acknowledge, though, that the accurate information was readily available before the accident? Six weeks before the accident, it was posted on the charts, and I'll directly address that with a timeline briefly, Judge Smith. In April of 2008, Contango sends the as-built documents, which shows you where the pipeline is, to the Coast Guard, to the MMS, and to the National Oceanographic Service in April of 2008. They have it. They don't put it on the charts for a year and a half later. It's a discretionary thing. The government, they put it on the charts when they want to. They didn't put it on the charts. August of 2009, a year and a half later, Weeks gets the contract, begins the work. It's still not on the charts. November of 2009, Jennifer Caldwell, the person on the Weeks dredge, downloads the charts, not for purposes of looking for the pipeline because we were relying on the government, but just orient herself with the area. It's still not on the charts in November of 2009 when she looks at it. Three weeks later, it pops up on the charts miraculously. December 2, 2009, it pops up on the charts. So the accident's in February of 2010. So run that out. Between December of 2009 and February of 2010, Judge Lake is now making Weeks Marine do an independent investigation for that two months that they're not supposed to do and not permitted to do, really, under Hollaback in Michigan, Wisconsin. Do we have to check the charts every day? What if it wasn't on the charts in November of 2009 when she downloaded it, even though she wasn't looking for it? What if she was looking for it in November of 2009 and it wasn't there? What if she had looked at the charts and the pipeline was there? Would they have gone back and renegotiated the contract and asked for more money? They could have because part of why they bid the contract is the expense that it incurs. Is that in the record that they could have? Yes, yes, it is in the record. And the government would have acceded to that? I don't know that. I can't answer that directly, Judge, whether they would have acceded to it. What does the record say about their ability to go back and renegotiate the contract price? I don't know. I can't answer that directly. I wish I could. But what I can tell you is that if there's five pipelines, because when there's a pipeline, they have to bring somebody on board. They take their time going over the pipeline. It costs extra money and takes extra time. So if there's five pipelines, it costs $100 to move over the pipelines. If there are eight pipelines, it costs $150. So the contract bid price is more. I just want to know what the record says about after the fact, if the government hadn't told them they found out about it, they could get a contract amendment. I don't know. I wish I could answer it directly. I just don't know that. What about there was something I read about there was a device that they had on board maybe that could actually look down at the pipeline floor and they could see what, I mean, the channel floor bed. There's something called a fathometer, which can tell you depth of water and whatnot, but not necessarily a pipeline right there in front of you. I don't think there's a device that will tell you that there's a pipeline right underneath you, except there's a fathometer that tells you the depth of water, I believe. I realize that I'm running out of time here. So what the court has required, what Judge Lake required, was an independent investigation between December of 2009, when they finally, after a year and a half, the government just miraculously pops it up on the chart, in February of 2010, and that's what Judge Lake required us to do. By way of example, what if it was never published on the charts, ever? What if it just didn't show up on the charts until maybe March of 2010, after this accident? Would Judge Lake have required an independent investigation, like a further independent investigation? Weeks had access to the MMS. Weeks had access to the U.S. Coast Guard who had the as-built drawings. Should weeks have then said, well, maybe I need to go further. I need to go to the MMS. I need to go to the Coast Guard. No, that's not what the Fifth Circuit said in Michigan, Wisconsin, and Hollaback. Do you agree with Judge Lake finding that there was a presumption that you were negligent and the burden was on you to overcome that presumption because a moving object hits a stationary object, or whatever the admiralty rule is, and it's presumed that the moving object is to blame, and you had the burden of overcoming that presumption? Understood, Your Honor. That is a sound principle of law upon which we agree. But the rule is, the rule is very simple. That rule only applies if Weeks Marine knew or should have known that the pipeline was there. In order for that presumption to kick in, you have to then buy into that Weeks Marine should have known the pipeline was there. And in this case, because we relied on the government, we say that Weeks Marine should not have known or did not have constructive knowledge of it, I would say. Even if we did have constructive knowledge, Judge, we just have to prove by preponderance of the evidence that it is the fault of a third party. And in this case, because that rebutts the presumption, if you accept the presumption of fault, then Weeks has to come in and prove it's the fault of a third party. We think we've done that by proving we reasonably relied on the government and it was the government's fault. And I think I'm finished. Thank you. Thank you all. You've saved time for your vote. Yes, Judge. Mr. Collette. May it please the Court. I'm Matthew Collette from the U.S. Department of Justice on behalf of the United States. Our appeal here is limited to the district court's holding that the exculpatory clause in the permit issued to Contango did not apply to the situation. We submit there were two errors. First, the district court misinterpreted the clause. And second, even under the district court's interpretation, this liability here did arise out of the permit within the meaning of that clause. Are we bound by prior precedent of this court? The prior precedent that this court, I assume you're talking about Michigan-Wisconsin and the Southern Natural Gas. None of those cases talked at all or ruled upon the exculpatory language here. Michigan-Wisconsin, I believe, was actually a dispute between the contractor and the government. Southern Natural. That case did not address the exculpatory clause at all. I don't know exactly why. But here we do have it. There is case law addressing exculpatory clauses like this one. And I think our key point is that you need to look at this clause as a whole, looking at the regulations that surround it, looking at the genesis of this regulation. And it is a regulation. This is not a contract. It is in the CFR in Appendix A of Part 325, 33 CFR. It needs to be interpreted in light of that. It does say damages to the permanent project or uses thereof as a result of current or future activities. That is, the government does not assume any liability. But there is an existing regulation that was not changed when the permit language was changed that says the government shall in no case be liable. It says the permittee has to be informed that the government shall in no case be liable. That is the same language that was interpreted by the First Circuit and the Ninth Circuit. So if we have a situation where the government does not update anything, doesn't tell anybody about this new pipeline, but they've signed off on this clause, the government is not liable, even though they neglected to tell anybody about it? Not liable to the permitted, the permittee. The question of the liability vis-à-vis the contractor is a different. So there would be no obligation to tell the permittee about the pipeline? No, well, no legal liability here. This is about allocation of risk. This is, and if you look at the Federal Register notice when the permit language was changed, you'll actually see that it's very similar to the language used by the courts in the Boston Edison case, the U.S. versus 5.96 acres of lands in the Pacific Northwest Bell case. The point is we are granting you a permit to have a submerged pipeline or cable in the navigable waterways. And you, the permittee, are assuming the risk, the inevitable risk, that that causes of having a submerged pipeline in the navigable waterways. So when the Corps has to do its job of maintaining the navigable waterways, then there will be problems. That is inevitable. And again, this is sort of the language of those previous cases. And so the allocation, you are assuming the risk, contractor, or I mean permittee. We are not. So in our view, when the Corps changed the regulation, changed it to say we are not assuming liability, it was not changing the previous regulation. It was making clear that trying to make the regulation a little more readable, trying to make the permit language a little more readable. But when it promulgated that, it said we are promulgating this not to change it but to make it clearer. A commenter said, why don't you just get rid of that at all? Get rid of the entire clause because you're liable anyway. And the Corps in the Federal Register said, no, that's not our intent. It's never been our intent to assume that kind of liability for damage to the permitted structure. It mentioned dredging as part of the activities and said that is, in fact, an acceptable limitation on the privilege of constructing a private structure in the navigable waterways. So I think to the extent the district court focused on the language assume and said, well, no, you're assuming something that it only applies to liability you didn't already have. I think it's wrong. This is about allocation of risk, and that's why the language assume is in there. In fact, under the district court's rationale, it's hard to imagine when this clause would ever apply. As far as I know, the Corps has never been sued by a permitting company saying, you were negligent in granting us the permit that we asked for. And that seems to be the only way that this language would apply. See, I'm also running out of time, but we also believe that even under the narrow interpretation, that is, the liability has to arise out of the permit, this case is one of those cases. The point of the liability here was the Corps granted the permit, and therefore the Corps should have known it was there, should have put it on the charts. And I think if you look at the Southern Natural Gas case, which the district court used to find liability here, you will find that the court in that case talked about the comprehensive regulations to manage both the underwater structures and the dredging activities, and said the Corps is in a unique position of possessing all information relevant to those structures, and therefore it has the duty to prevent dredging activity from causing damage. That language is parroted in the complaint in this case. It's parroted in the reply to our summary judgment motion. The point is the Corps is in a unique position because of its permitting activities, and therefore it has a duty to put it on the charts and to avoid that. That is exactly what this exculpatory clause is intended to cover. All right, thank you. Thank you, Your Honor. I'll let you save time for rebuttal. Ms. Milholland? Good morning, Your Honors. Karen Milholland for Plaintiff Appellees. Neither defendant in this case wants to be held responsible for their negligent acts. Both want the other to pay for the damage, but each is liable. I'm going to address first why the government is not shielded from liability, and second, why weeks cannot shift its liability to the United States. The permit was correctly interpreted by Judge Lake under sound principles of construction that required the court to look first to the plain language, to the four corners of the document that it is interpreting. There is no claim here that there is ambiguity in this wording, so there is no reason to look beyond the permit. The plain permit wording says the government does not assume any liability in issuing this permit. Permits are issued as part of the government's broad regulatory authority over navigable waters, and by exercising that regulatory authority, the government does not assume liability for the safety of structures it permits. Judge Lake held the plain meaning of this wording precludes a plaintiff from using the permit or its issuance as a basis for liability against the government. The government liability here is not based on an assumption of liability for damage to the pipeline. Its liability does not arise because the construction permit was inaccurate, improper, or wrong. Judge Lake based the government's liability on independent common law duties found in Southern Natural Gas in Michigan, Wisconsin. If Contango's claim was based on a theory that the government had assumed a liability it did not previously have, or that there was government negligence in issuing the permit, for example, the pipeline was struck because the government required too shallow of a burial depth, then the permit clause might preclude recovery, but it does not shield the government from liability for negligent performance of duties that are independent and unrelated to the permit. The government relies upon the disclaimer in paragraph B of the permit, which addresses damages to the project as a result of current or future activities undertaken by the U.S. in the public interest. The future activities referred to are clearly authorized activities because they are undertaken in the public interest. Unauthorized and negligent activity is not referred to. It's not included. No one argues that hitting a pipeline is an authorized government activity or in the public interest, and that cannot be the activity being referred to in the permit. The permit does not at all address, let alone remove, extant common law liabilities for negligent acts. The disclaimer does not use the word negligence, and it does not limit recovery of damage claims except for one. That's found in paragraph E. It's in the record at page 168. Paragraph E bars recovery for damage claims associated with any future modification, suspension, revocation of the permit. For example, the cost to rebury the pipeline if the Corps later decides to deepen the ship channel, and eventuality that Contango was warned about when the permit was issued and was told that the Corps would not assume liability for those costs if it later deepened the ship channel, requiring that the pipeline be buried deeper. Judge Lake's ruling is consistent with the only other on-point case that interprets this identical wording, and that's the Banks case from the Court of Claims, which involved a taking and held that the limiting clause of the permit is irrelevant because the government is liable for takings as a matter of law, and its existing legal liabilities do not arise under and are not assumed through the permit. The Corps wants you to interpret the permit by requiring that you read in an exculpatory intent that is not stated and assume that by liability in issuing the permit, it meant all liability for damage to permitted structures however and whenever caused. That interpretation that it seeks has been given in cases interpreting permits before 1986 where the operative language is that the U.S. shall in no case be liable and no claim or right to compensation shall accrue. The Court's interpreting wording similar to that here, where the government refuses to assume liability, has said that that means a voluntary assumption of liability, not a liability that is imposed by law. The government does not say that Judge Lake's interpretation of the permit wording is unreasonable or that it's ambiguous, but it points to inadmissible evidence of intent. What if we had no contract language in just the regulation? Why wouldn't we consider the regulation? Judge, if we had just the regulation and the regulation was at issue, then we would look to the regulation. But in this particular case, the regulation that is involved, which is 33 CFR 320.4, it just sets forth the criteria for evaluating permit applications. It's not even at issue here. The regulation itself does not even appear in the permit, and that's why there's no reason to look at it. I thought there was language in the regulation that said the United States isn't liable for damages, including that called dredging. What it says in 320.4G is that future federal projects that may require removal, reconstruction of a permitted structure, that the government will in no case be liable for damage or injury that may result. It does not address negligent undertakings by the Corps of Engineers. And the comment- What does it say about dredging? It says nothing that I'm aware of, Your Honor, about dredging in 320.4G. That section addresses future federal projects. And the comment in the Federal Register from 1986 supports Judge Lake's and the bank's court interpretation. That says it has never been the intent of the Corps to ensure that no interference or damage to a permitted structure will occur after it has been built, and its expressed intent is not to assume a duty as a guarantor of the structure. There is no intent expressed to globally exculpate the government from all tort liability outside the scope of the permit. For example, it's not credible to argue that if a Coast Guard cutter rams a permitted platform because the captain was drunk, that the government is immune from liability for that negligent act because it issued the construction permit that authorized the platform. The government's position that it's insulated from liability for any and all negligence in navigable waters as long as a permitted structure is involved makes no sense. That type of blanket immunity conflicts with the purpose of the Suits and Admiralty Act that preserves to the plaintiff a private right of action against the government. The government is in the unique possession of possessing all the information relevant to structures and activities it permits, and as the regulatory authority, it has the power to prevent the danger of dredging over pipelines. The government here was properly held viable for its dereliction of duty to use due care, and the permit wording does not excuse it or shield it from that liability. Could the permit have been written in such a way where the government included this type of liability? It certainly could, Your Honor, and the wording that it chose reflects that it did not intend to do that. The earlier permit wording has been interpreted to exculpate it from liability, but that wording was changed in 1986. And if the Corps has the ruling from the bank's court, if that ruling is out there for them to know and understand, if they think that the wording was intended to say something different, then the recourse is to change the wording after that ruling, not to try to— So the regulation does contemplate that there can be permits where the government's liable? Yes, Your Honor. So we just ignore the regulation and look at what the permit says? I think you only have to look at the permit because in this case— Well, we've got the regulation. You said, well, the regulation doesn't say that. Now, in response to Judge Prado's question, you said, yes, the permit would allow liability. I'm sorry, the regulation would allow liability. So how can we ignore the regulation? Your Honor, the regulation allows liability—or what it says is it addresses one circumstance, which is if the structure has to be modified or changed at some point, that the government is not liable for the cost for that modification or removal or whatever has to be done. Well, the comment talks about safety of the structure from damages caused by channel maintenance dredging. That's pretty specific. The comment says it's never been the intent of the Corps—it's part of that wording— to ensure there's no interference or damage to a permitted structure after it's built. In other words, they're unwilling to take on the duty as a guarantor of the structure. It's not a strict liability issue, but it doesn't rule out negligent acts outside of the permit itself, which involve dredging and other activities. Turning to Weeks Marine's liability, Weeks does not dispute that it has fault, but it points its finger at the government and says its liability should be shifted. It cites Michigan, Wisconsin as authority for passing off its liability. But Michigan, Wisconsin makes Contango's point. First, it affirms the judgment holding the dredger liable to the pipeline owner. It did not relieve the dredger of direct liability to the pipeline owner, and that's in the opinion at page 946. Second, it allowed the dredger a third-party claim for indemnity against the United States, based on a finding that it justifiably relied on the contract. Here, there are no grounds to shift Weeks's liability, because Judge Lake found that Weeks was not justified in relying solely on the contract and dismissed the cross-claim against the government. Michigan, Wisconsin held that omission of a pipeline from a government contract was a representation by the United States that was justifiably relied upon by the contractor. No evidence was presented in that case that contrary information was available to the dredger showing the pipeline. There are no grounds to support shifting liability here. Here, the finding of fact was there was no justifiable reliance by Weeks, because Weeks failed to use information that was in its possession and that was readily available to it to avoid the elision. In your view, how often, to avoid negligence, how often should it have checked for the updated information? Your Honor, in this particular case, 10 months passed. How often a dredger should take due care is really a matter of reason and common sense, but in this case, 10 months passed between the time the bid documents were prepared that omitted the pipeline and February 2010 when the dredge was in the Atchafalaya Channel and hit the pipeline. Again, let me ask you, how often under any kind of duty of reasonable care, reasonable vigilance, how often should they have checked? Every day, every week, every month? Your Honor, mariners are held to an ongoing duty of care. For example, once an NOAA chart issues, they are supposed to download any updates that come along and they're notified of those updates, and the local notices to mariners are issued weekly. They're supposed to check those notices. I thought the regulations said this ship, this platform, whatever, was not a vessel and was not subject to those regulations. Your Honor, Judge Lake held that this vessel had no statutory duty to carry charts. That was his sole holding. Just because there's no statutory duty under the maritime law does not mean it's reasonable. It does not mean that a prudent dredger or a prudent vessel operates without charts. There's plenty of case law from this circuit that says that vessels must carry charts and must check local notices to mariners and that that is a basic. What if the NOAA charts had been changed two days before this? Your Honor, we would argue that it still had a duty to check them. That's why we have charts. That's why we have, for example, not even just charts. We have an MMS pipeline database. The testimony from weeks was that typically they call Louisiana One Call or they call the MMS pipeline database and look there also to make sure there's no pipelines in the dredge area. They failed to do that for this particular job. They failed to use the local notices to mariners that were in their possession and that showed the pipeline. They used them for other purposes to make sure that other people were warned that they were dredging in the area but not for themselves to use. And you were correct in your earlier question. The dredge did contain a high pack guidance system, which the captain testified allows the dredge to download the current NOAA chart and impose it over the dredge area so that it can see hazards on the NOAA chart as they're coming up. But the dredge did not use any of that information or any of those items it had available to it to use. In addition, the flotilla vessels had current charts that showed the pipeline, but they had not been instructed to advise the dredge if one was coming up. The testimony was one of the flotilla vessels radioed the dredge after the incident and said, gosh, our NOAA chart shows a pipeline right there. And the flotilla was operated by weeks? Yes, Your Honor. The captain testified that he was in charge of the flotilla. The project engineer and the dredge captain both testified they were aware of discrepancies in the government contract that should have put them on notice, that there were things that may not be in the contract. In fact, the contract itself warns of that. And they had access to the MMS database. Ten months, the time between the issuance of the contract documents and when they were dredging and hit the pipeline is a long time in the Gulf. The Gulf is constantly changing. Contango built its pipeline in five months. How many other changes and hazards arose out in that area during that time that we simply ignored? It ignored public information that is relied on as vital safety information by every Marine operator. Could they have renegotiated their contract to get more money? Had they found out about the Contango pipeline? That I do not know, Your Honor, and I don't recall there being any testimony in the district court about that. The conduct of the dredger in Michigan, Wisconsin, was much less culpable than Weeks here, and this court affirmed the dredger's liability. Weeks Marine also argues that finding it owed a duty to avoid hitting the pipeline is inconsistent with the finding that it had no independent duty to investigate under the government contract, but that is not inconsistent. The second is a contract duty between the Weeks and United States. The first is an independent duty owed to pipeline owners under the common law, and we know that the risk-shifting indemnity that Weeks seeks here must be contract-based because indemnity between maritime tort feasors is available only when proportionate fault cannot rationally be determined between them. That's been the law since Hardy v. Goldfoyle in 1992. Here, fault was determined between them. The duty in inquiry in a dredge accident is foreseeability of the injury. Property damage and personal injury is a foreseeable result of hitting a pipeline. The ease of avoiding the harm by consulting— Was there any evidence that there was overdredging when this pipeline was hit? Yes, Your Honor. The United States claimed that as a defense, and there was testimony on both sides on that issue. There was testimony that the dredger is given some leeway to go beyond the contract authorization, but in this case, there was evidence that they went beyond the leeway. The evidence was that they hit the pipeline 15 feet outside of the channel, and the XY coordinates were given for that location. It was not disputed, and that was a finding that has not been appealed. Did anyone testify that 15 feet outside the channel was outside the leeway that the government gave them? It is outside of the contract parameters, which were the width of the channel and the depth, but there was also testimony to the contrary, Your Honor, that the court allows them some leeway. And what is some leeway? Is this 15 feet within the leeway or not? I don't think there was testimony one way or the other on that issue. Based on the number and quality of negligent acts by Weeks Marine, it properly was allocated 40% of the fault. It was found in violation of two duties. Its duty as a dredger to avoid hazards in the dredge path, and its duty to use due care in the operation of a vessel and avoid the elision, which included the presumption of fault under the Louisiana rule. That second duty is important because it's a non-delegable duty. It cannot be shifted to the United States. That particular duty was not involved in the Michigan-Wisconsin case. Only the first duty was. It was framed by that court as a duty to inspect for hazards, but that second duty of care and the presumption of fault under the Louisiana rule, the duty of care owed as a vessel operator, cannot be discharged. Weeks Marine is one of the largest, if not the largest, dredging contractor in the nation. Its conduct affects a wide class of persons. And its argument that it can stick its head in the sand and ignore information of a pipeline warning, a pipeline hazard, that information that's readily available to the general public, information that's relied on by all mariners and which is critical to safety in the Gulf, and its utter negligence in doing so. What do we do with the fact that there was evidence that it was just industry custom to rely on the contract specifications? Do we ignore that entirely? No, Your Honor. It's relevant that it was industry custom, but as you well know, industry custom does not set the standard of reasonableness, and that is what Judge Lake relied on. It simply is not reasonable in this day and age for any contractor to say, I'm going to just look at the contract specifications and ignore all the normal safety information that every other mariner uses. It's not reasonable. It results in accidents like this. And the ease of taking the actions to avoid the harm is so small that it must be held liable for refusing to take those and for focusing solely on the contract itself. All right. Thank you, Ms. Milholland. Thank you. We ask that the underlying judgment be affirmed in all respects. All right. Mr. Tillery, you say time for rebuttal. Judge, I know that I have three minutes, Your Honors. As a practical matter, what happened in Michigan and Wisconsin was very simple. The court said that we were going to maintain the third-party demand of the contractor against the government and assess the government with 100% fault. In this instance, Judge Lake dismissed Weeks Marine's cross-claim, stating that we needed to go back to the contract officer under the Contracts Dispute Act, and we still have our claim as a practical matter to go after the government later, pursuant to the administrative remedies for reasonable reliance and whatnot, and Judge Lake is going to let us do that. But this court can be practical and follow Michigan-Wisconsin and, as judicial economy purposes, can say 100% fault on the government, save all of those resources in the future as a practical matter so that Weeks Marine does not have to do that. Secondly, with respect to the charts, let's remember that the government had this information with respect to the pipeline a year and a half before the government chose to just fortuitously put it on the chart six weeks before this accident. The government chose not to put it on the charts. When Weeks began dredging in August, the pipeline itself was not on the charts. The government still chose not to put it on the charts. It wasn't until December of 2009, 60 days before the accident. Did the flotilla have it on their charts? I think the flotilla did, but still the... There's conflicting evidence on that, but I think there is some evidence of that. Yes, Judge? Was there a device on the dredge that could have downloaded... I think there was something called a magnometer or something like that. I don't know if it was actually on the dredge, but I know they're available. But I don't know that they tell you that there's a pipeline way up ahead of you. I do not know that, as to whether that particular device can do that. The question then becomes, who does Weeks Marine rely on, on the charts that the government posts, or the Corps of Engineers' specifications when the Supreme Court has said the word must in Holaback? Weeks Marine must, M-U-S-T, take that specification as true. And Holaback says that as a holding, and Michigan-Wisconsin follows the words there. Ms. Mulholland argues that for 10 months we were out there dredging, and we should have used due care and should have looked to the charts. But again, I point out that it wasn't on the charts for 10 months during that dredging period. It wasn't on the charts for 10 months. It was on the charts for about 6 weeks, December of 2009 to February of 2010, maybe 2 months. 2 months it was on the charts at that point. And as a practical matter... But don't we look at the fact, though, that it hadn't been checked for 10 months to decide whether the conduct was reasonable? The fact that we had been dredging for 10 months, absolutely. But the fact that it had not been put on the charts and they had had the information for more than 2 years demonstrates that the government itself was unreasonable and Weeks was reasonable in relying on the government, Your Honors. And Weeks' reasonable reliance on the government is mandated by Holaback and the Supreme Court. So as a practical matter, again, in a vacuum, if it's just Weeks and Contango, I understand the argument is logical. Hey, she would have looked at the charts. But this is more of a detrimental reliance, custom-in-the-industry argument, and Weeks did what the Supreme Court told them to do for years. Thank you very much. All right, thank you, Mr. Tillery. Mr. Collette, you've saved time for a vote. Thank you, Your Honor. First, I'd like to address counsel's statement that we are arguing that we wouldn't be liable under any circumstances, any and all negligence, I think she said, however and whenever caused. I don't think that's accurate. That argument was made with respect to the previous permit language, and the court said, no, no, we're only talking about when the United States is discharging its special duties and responsibilities over navigable waters. This isn't an unlimited exculpatory clause. The other thing I'd like to address is the notion that there's no ambiguity here. I think there is ambiguity. You have a regulation that uses the, in no case shall be liable, which says when there's an applicant, you need to inform them that the United States shall in no case be liable. You have a statement in the notice of proposed rulemaking that says we are just trying to make this permit language more understandable, and you have that statement again in the final rule. The other thing I'd like to talk about is the notion of assuming liability. I think that's the crux of the district court's ruling. That's the crux of counsel's argument, saying you change the language to say assume. I think if you look at the Pacific Northwest Bell case and you look at a quote from that, you will see that it's very close to what the court tried to do here. What Pacific Northwest Bell says is the effect of the condition here imposed, that's the previous language, simply to place upon the permittee the risk of damage to the permanent structure resulting from activity of the United States that is undertaken to meet its continuing obligations respecting navigation. If you look also at the Schoonover case cited at page 17 of the district court's summary judgment ruling, that interprets Pacific Bell in a very interesting way. It says, citing that language, the permittee has assumed the risk that such a decision, that is the government's decision to conduct these activities, may be necessary and may cause damage. So if you look at it in the full context of what was going on here, the court changed the language to assume the risk to talk about the allocation of risk. We're permitting structures under the water, we're permitting dredging and other activities on the water, and it is not the government that's assuming the risk, whether it's negligence or not, and the other cases deal with that as well. The argument was made in those cases, wait, that doesn't cover negligence, it doesn't say that. No, we're talking about anything in the public interest in managing these diverse and essentially inconsistent activities. It is the permittee who is assuming the allocation of risk here for any of the activities the government does in trying to maintain the navigable waterways. If WICS had discovered the Contango Pipeline before it dredged, could they have renegotiated the contract to get more money? That is a good question, and I also don't know the answer to that question. I'm sorry, Your Honor, whether they could come back and do it. I think that it might not be, but I don't know. I mean, there was evidence, apparently, that the bid is based on the number of pipelines they have to cross because it costs more money to dredge around pipelines. But I'm not sure I completely understand that because a lot of the materials were provided after the contract was awarded. So I think the bid might be based on what parties assume or think may be the problem. I think, you know, like any bidder, they do a lot of research about what they think it's going to cost. Another bidder might do research about what they think it's going to cost and say, well, we're not going to bid here because we know more. But I just don't know whether it's subject to renegotiation. All right, thank you, Mr. Connery. Thank you. Your case and both of today's cases are under submission. Court is in recess and at usual order.